IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-523-D

| | |
|---|---|
| THOMAS BAILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon the parties' cross Motions for Judgment on the Pleadings. (DE's 28 & 30). Plaintiff has also filed a reply. (DE-34). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation. (DE-32). For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-28) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-30) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on July 27, 2007 alleging that he became unable to work on September 1, 2006. (Tr. 45). This application was denied initially and upon reconsideration. *Id.* A hearing was

1

held before an Administrative Law Judge ("ALJ"), who determined that Plaintiff was not disabled during the relevant time period in a decision dated November 5, 2009. *Id.* at 45-52. The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on September 9, 2010, rendering the ALJ's determination as Defendant's final decision. *Id.* at 1-5. Plaintiff filed the instant action on November 23, 2010. (DE-4).

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> 
> 42 U.S.C. § 405(g).

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by

2

substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

**Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 1, 2006. (Tr. 47). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) residual effects of lumbar discetomy; and 2) psoriatic arthropathy. *Id.* However, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 48. Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain exceptions. *Id.* at 48.

3

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was not able to perform his past relevant work. *Id.* at 51. However, based on the testimony of a vocational expert ("VE"), the ALJ determined there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed during the relevant time period. *Id.* at 51-52. Accordingly, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. *Id.* at 52. These determinations were supported by substantial evidence, a summary of which now follows.

Plaintiff's primary care physician is Dr. Melissa Gilmer-Scott who has been treating him since December 2005. *Id*. at 329. In March 2006, Dr. Gilmer-Scott referred Plaintiff to Dr. Alfredo Rivadeneira for an evaluation of polyarticular arthritis and psoriasis. *Id*. at 278, 328. She assessed Plaintiff's RFC on September 5, 2008. *Id.* at 381-386. She noted that Plaintiff was diagnosed with psoriatic arthritis and his primary symptoms were pain, stiffness and joint swelling. *Id.* at 381. Dr. Gilmer-Scott opined that Plaintiff was capable of tolerating the stress associated with low stress jobs. *Id.* at 382. She did not assess Plaintiff's ability to walk, sit, stand, or lift. *Id.* at 382-385. Indeed, Dr. Gilmer-Scott chose to simply leave a large portion of the RFC assessment form blank. *Id.* Nonetheless, after omitting these sections, she concluded that Plaintiff was incapable of working full time at any level of exertion. *Id.* at 386. Notably, in an August 27, 2009 treatment note, Dr. Gilmer-Scott observes that Plaintiff recently had been "welding and working in [the] yard for a few hours." *Id.* at 459.

Dr. Rivadeneira stated on March 24, 2006 that Plaintiff was: "negative for: fatigue, loss of appetite, abnormal sleep pattern, fever, chills, night sweats, weight loss, nausea, vomiting, diarrhea, abdominal pain, melena, hematemesis, easy bruising, epsitaxis, dyuria, hematuia, frequency, discharge, cough, dyspnea, hemoptysis, chest pain, PND, orthopnea, or leg edema ... "

4

*Id*. at 418-419 He made similar observations on April 27, 2006; June 23, 2006; August 24, 2006; January 4, 2007; May 17, 2007; September 27, 2007; July 24, 2008; and January 22, 2009. *Id*. at 264, 368, 403, 409, 406, 412, 415, 432.

Dr. Alan Cohen evaluated Plaintiff on October 31, 2007. *Id.* at 292-295. Plaintiff's chief complaint was back pain. *Id.* at 292. It was noted that Plaintiff was currently using Methotrexate and Plaintiff specifically denied any nausea, nor were any other medication side effects reported. *Id.* at 292-293. Upon examination, Plaintiff: 1) had no muscle atrophy; 2) could sit, stand, squat, and ambulate; and 3) had a steady gait and full muscle strength. However, Plaintiff had limited range of motion of the thoracolumbar spine. *Id.* at 293. Plaintiff was diagnosed with status post discectomy with chronic strain and psoriasis with acute arthropathy of the right hand. *Id.* at 294. The prognosis for both of these conditions was stable. *Id.* It was noted that Plaintiff did not require an assistive device for ambulation. *Id.* Likewise, Plaintiff's ability to sit and stand were not impaired by these conditions. *Id.* Plaintiff's ability to move about and carry were only mildly impaired, and his ability to lift was moderately impaired. *Id.*

X-rays of Plaintiff's right hand taken on October 31, 2007 showed no evidence for fracture or any other bone or soft tissue abnormality. *Id.* at 296.

On November 29, 2007, Dr. Janet Johnson-Hunter assessed Plaintiff's physical RFC. *Id.* at 298-305. It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying. *Id.* at 299. No postural, visual, communicative, or environmental limitations were noted. *Id.* at 300-302. Dr. Johnson-Hunter determined that Plaintiff was

limited with regard to handling and fingering. *Id.* at 301. Specifically, she opined that Plaintiff could engage in frequent, but not repetitive handling and fingering with his right hand. *Id.* No manipulative limitations were noted with regard to reaching or feeling. *Id.* Ultimately, Dr. Johnson-Hunter stated that Plaintiff was able to perform medium tasks with limitations. *Id.* at 304.

Plaintiff was examined by Dr. Rivadeneira on January 4, 2007. *Id.* at 266-267. It was noted that Plaintiff's psoriatic arthritis was "doing very well." *Id.* at 267. Furthermore, Plaintiff had a full range of motion in his shoulders, neck and hips. *Id.* On May 17, 2007, Plaintiff reported increased back pain after he stopped taking his medications for financial reasons. *Id.* at 264. Again on September 27, 2007, Plaintiff had not taken his medications for two weeks due to financial difficulties. *Id.* at 314. Nonetheless, Plaintiff's "psoriatic skin disease" was "unchanged." *Id.* His main symptoms were localized to his low back. *Id.* Plaintiff was examined again on February 21, 2008, when his chief complaint was "right-sided flank pain." *Id.* at 309-310. Because of a recent arthritis flare, Plaintiff was started on a 20-day prednisone taper. *Id.* at 309. After that treatment, Plaintiff's joint pain was tolerable and his swelling was decreased. *Id.* at 310. Specifically, Dr. Rivadeneira noted that Plaintiff's "primary concern today is his right flank pain and he expresses no other concerns or complaints at this time." *Id.* at 310. He also described Plaintiff's joint symptoms as "minimal." *Id.* at 311. During this examination, Plaintiff had full motor strength in his upper and lower extremities, as well as normal sensation. *Id.* On May 21, 2008, Plaintiff complained of joint pain and was diagnosed with "psoriatic arthritis which is currently flaring." *Id.* at 306-307. Upon examination, Plaintiff was not in distress and had full range of motion. *Id.* at 307. Plaintiff complained of left foot pain on July 24, 2008. *Id.* at 332. His skin disease was stable, although his arthritis continued to

interfere with his daily activities intermittently. *Id*. at 333.

On August 19, 2008, Dr. Rivadeneira assessed Plaintiff's RFC. *Id.* at 361-366. He noted that Plaintiff had been diagnosed with psoriatic arthritis, and that Plaintiff's primary symptoms were joint pain, stiffness and skin rashes. *Id.* at 361. According to Dr. Rivadeneira, Plaintiff was not a malingerer. *Id.* at 362. Dr. Rivadeneira was not able to determine the degree to which Plaintiff could tolerate work stress. *Id.* at 362. Likewise, Dr. Rivadeneira stated that he was unable to determine how far Plaintiff could walk because doing so would "require a formal functional capacity evaluation done by a certified physical therapist." *Id.* at 363. In addition, Dr. Rivadeneira was unable to determine how much Plaintiff could lift because that would also "require a functional capacity evaluation by a [physical therapist]." *Id.* at 364. He also noted that none of the medicines prescribed for Plaintiff's psoriatic arthritis had side effects which had implications for working. *Id.* at 363. Furthermore, he opined that Plaintiff needs a job that permits shifting positions at will from sitting standing or walking, and that Plaintiff would sometimes need to take unscheduled breaks. *Id.* Dr. Rivadeneira concluded his RFC evaluation by indicating he was unable to determine whether Plaintiff was able to work a full time schedule at any level of exertion. *Id.* at 366.

During a October 23, 2008 examination, Plaintiff complained of fatigue, joint pain and palpitations. *Id.* at 434. It was specifically noted that Plaintiff "continues to . . . [experience] nausea with methotrexate that lasts 2-3 days after he takes it." *Id.* at 435. His methotrexate dosage was decreased to address Plaintiff's nausea. *Id.* However, Dr. Rivadeneira later notes that Plaintiff is "negative for . . . nausea . . . [and] vomiting." *Id.* Despite Plaintiff's complaints, it was also observed that Plaintiff's psoriatic arthritis had improved. *Id.* Dr. Rivadeneira recommended that Plaintiff begin a "graded low-impact aerobic exercise program." *Id.*

7

However, on November 8, 2008, Dr. Rivadeneira drafted a letter "to whom it may concern" stating that Plaintiff had been diagnosed with psoriatic arthritis. *Id*. at 464. He further stated that Plaintiff "continued to experience flare ups of his arthritis that made it increasingly difficult for him to perform his daily activities and work." *Id*. Dr. Rivadeneira added that Plaintiff's medications relieved his symptoms but not completely. For these reasons, Dr. Rivadeneira opined that Plaintiff was unable to work fulltime due to his arthritis being active. *Id*. Finally, Dr. Rivadeneira was unable to determine when Plaintiff would be able to return to work. *Id*.

During a January 22, 2009 examination, Plaintiff's psoriatic arthritis was described as "doing well", with decreased swelling. *Id.* at 431. Plaintiff's chief complaint during the January 22, 2009 examination was back pain. *Id.* His back pain was also "doing very well" until a recent exacerbation. *Id.* at 432. However, Plaintiff had no radicular symptoms. *Id.* at 432. Likewise, on May 20, 2009, Plaintiff's psoriatic arthritis was described as "stable on a combination of methotrexate and Humira." *Id.* at 450. Specifically, Plaintiff reported "complete resolution of the psoriatic skin lesions and improvement and almost complete resolution of the dactylitis in his feet." *Id.* Furthermore, Plaintiff was not experiencing any nausea or vomiting symptoms. *Id.* at 451. Plaintiff also denied any joint pain or swelling. *Id.* at 450-451. Ultimately, Dr. Rivadeneira concluded that Plaintiff's psoriatic arthritis was "doing very well." *Id.* at 451. His low back pain was still present intermittently. *Id.* Upon examination, Plaintiff's straight leg test was negative and he had full muscle tone and strength throughout. *Id.* Plaintiff was diagnosed with "[c]hronic low back pain with some radicular symptoms on the left side." *Id.*

Dr. Gonzalo A. Fernandez examined Plaintiff on September 26, 2008. *Id.* at 387-388. Plaintiff's chief complaints were chronic low back pain and psoriatic arthritis. *Id.* at 387. The

8

chronic low back pain was rated by Plaintiff as 2 to 3 out of 10. *Id.* During the examination, Plaintiff was able to: 1) walk with a normal gait; 2) get on and off the examination table; and 3) sit comfortably. *Id.* at 388. He was not in acute distress. *Id.* Ultimately, Dr. Fernandez indicated that Plaintiff: 1) will have difficulty with extended periods of walking limited by his pain and mild lower extremity weakness; 2) had manipulative limitations on reaching, handling, feeling, grasping, and fingering frequently limited by his arthritis; and 3) had postural limitations on bending, stooping, and crouching frequently limited by his low back pain and his arthritis. *Id.*

Plaintiff's Physical RFC was assessed by Dr. Stephen Levin on October 29, 2008. *Id.* at 391-398. It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those noted for lifting and carrying. *Id.* at 392. Dr. Levin indicated that Plaintiff's reaching and feeling was limited, in that he could perform these actions frequently but not continuously. *Id.* at 394. No postural, visual, communicative, or environmental limitations were noted. *Id.* at 393-395.

An MRI dated June 2, 2009, showed normally aligned vertebral bodies and well preserved vertebral body heights and disc spaces. *Id*. at 454. Plaintiff's signal intensity from the vertebral body bone marrow and spinal cord was normal. *Id*. A loss of disc height and desiccation (dryness) was observed at the L4/L5 and L5/S1 levels; and there were endplate degenerative changes at the left of L5/S1. *Id*. At the L4/L5 level there was a posterior disc bulge causing mild central canal stenosis. *Id*. Likewise, at the L5/S1 level there was a posterior disc bulge causing mild central canal stenosis and moderate left neural foraminal stenosis. *Id*. No abnormal enhancement was seen, nor was there any evidence of significant scar tissue. *Id*.

9

Plaintiff testified during the hearing in this matter. He stated that he occasionally needs to use an assistive device to walk. *Id.* at 18. In addition, Plaintiff testified that he was frequently tired and that his medications made him "sick on . . . [his] stomach." *Id.* at 21. He also stated that these medications cause him to vomit on a regular basis and leave him feeling fatigued. *Id.* at 24. Furthermore, Plaintiff asserted that he was in pain most of the time and that he has to rest frequently. *Id.* Likewise, Plaintiff contended that he could not stand for an extended period of time. *Id.* Plaintiff testified that medications stabilized his psoriatic arthritis but did not improve it. *Id.* at 22-23. He also indicated that his doctor restricted him to lift only 30 pounds. *Id.* at 23. On a typical day, Plaintiff testified that he did little other than eat and watch television. *Id.* at 25.

Finally, the VE in this matter testified that a person with Plaintiff's RFC could perform jobs which existed in significant numbers in the national economy. *Id.* at 32-35.

Based on this record, the ALJ made the following specific findings:

> The claimant's impairments have been considered under listings 1.04, 8.05, and 14.09. There is no evidence in the record of nerve root compression or spinal arachnoiditis. Further, the medical records contain no indication of sensory or reflex loss, and straight leg raise tests were negative on several occasions (Exhibits 15F, 18F). An MRI of the claimant's lumbar spine showed mild central canal stenosis; however, the evidence establishes that the claimant is able to ambulate effectively. The claimant testified at the hearing that he uses a cane to ambulate, and that it was recommended by his doctor. However, both the consultative examiner and the claimant's rheumatologist noted that he does not require assistive devices to ambulate (Exhibits 2F, 10F). Physical examinations showed that the claimant walks with a steady, normal gait (Exhibits 2F, 13F). The claimant also stated that he is able to leave the house independently (Exhibit 3E).The claimant's impairments therefore do not meet listing 1.04.
>
> Listing 8.05 requires that a claimant experience extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed. The medical evidence indicates that the claimant has sought treatment on numerous occasions for skin lesions related to his psoriasis. Physical

examinations note that the claimant's lesions are primarily limited to his umbilicus, but that he occasionally experiences psoriatic changes in his finger and toenails or plaques elsewhere on his body (Exhibit 1F). During periods where the claimant experienced more widespread lesions, it was noted that these manifestations were clearing and that the claimant had recently discontinued his medication (Exhibit 6F). The medical evidence does not support a finding of extensive skin lesions that persist despite continuing treatment, and claimant's impairment therefore does not satisfy listing 8.05.

Listing 14.09 requires inflammatory arthritis causing persistent inflammation or deformity of a major peripheral joint with additional complications, or ankylosis of the spine. The medical records contain no evidence to support a finding of ankylosis and, as discussed above, the claimant is able to ambulate effectively. The claimant is able to prepare simple meals, perform household repairs, and care for his personal hygiene, indicating that he retains the ability to perform fine and gross movements effectively. The medical evidence does not support a finding that the claimant experiences severe fatigue, fever, or malaise as a result of his psoriatic arthritis, and the claimant's rheumatologist notes a history of weight gain rather than involuntary weight loss (Exhibit 15F). The claimant's impairment therefore does not satisfy listing 14.09.

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can stand and walk for only 2 hours in an 8 hour workday and is limited to occasional postural movements with frequent handling and figuring . . .

The claimant alleges disability due to chronic, severe pain in his lower back and joints as well as skin lesions related to his psoriatic arthritis. According to the claimant, he is unable to stand for prolonged periods and is constantly in pain. At the hearing, the claimant testified that his medication causes fatigue and he must nap frequently. The claimant also testified that his doctor has limited him to lifting 30 pounds and standing for 30-45 minutes with 20-30 minute rest periods, as well as recommending he use a cane. The claimant asserts that it takes him an hour to get out of bed in the mornings and that his medication frequently upsets his stomach and causes vomiting. On particularly bad days, according to the claimant, he spends most of his day in bed.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these

11

symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The medical evidence establishes that the claimant underwent a lumbar' discectomy with nerve decompression and was diagnosed with psoriatic arthropathy (Exhibits 1F, 17F). An MRI of the claimant's spine shows stenosis at the L4-L5 and L5-S I levels, some loss of disc height and desiccation, and endplate degenerative changes (Exhibit 18F). Physical examinations show that the claimant experiences dactylitis in his feet and synovitis in his hands, as well as psoriatic changes in his fingernails and toenails, but that these symptoms are not continuous (Exhibits 6F, 18F). The claimant's psoriatic arthritis causes joint pain, stiffness, rashes, tenderness, and swelling (Exhibits 10F, 11F). The medical evidence indicates a particularly severe episode during which the claimant experienced dactylitis of both feet, active synovitis, toenail and fingernail changes and lesions all at once. However, the claimant's rheumatologist, Dr. Rivadeneira, noted that this was a reactivation due to the claimant's discontinuing his medications (Exhibit 15F). The evidence otherwise indicates that the claimant's medications help to manage his symptoms, as prior to discontinuing his medications the claimant was "doing very well" (Exhibit 15F, p.8). In later examinations, Dr. Rivadeneira noted that the claimant's psoriatic arthropthy had improved and was doing well (Exhibit 15F).

Physical examinations of the claimant show a decreased range of motion of the thoracolumbar spine and fingers (Exhibits 2F, 7F). However, the claimant retains the full range of motion in his other joints and full strength in his extremities (Exhibit 6F). The claimant testified at the hearing that he does very little physical activity during the day, though he has been "known to cook" on occasion. The claimant stated elsewhere in the record, however, that he does household repairs, uses a riding mower to do yard work, cares for his 2 dogs with his wife's assistance, and enjoys fishing (Exhibit 3E). Though the claimant testified that he has no friends or visitors aside from his mother, he stated elsewhere in the record that he spends time with others and, on good days, attends animal sales and visits with his neighbors. The claimant is also able to drive and go out alone (Exhibit 3E).

In terms of the claimant's alleged side effects, the claimant repeatedly reported during medical visits that he was not experiencing nausea, vomiting or other symptoms .of upset stomach (Exhibit 6F). Dr. Rivadeneira noted no side effects caused by the claimant's arthritis medication, and the claimant's treating physician noted only that his pain medication may cause drowsiness (Exhibits 10F, 11 F).

The claimant's treating rheumatologist was unable to offer an opinion as to

> the effect of the claimant's impairments on his ability to perform basic work activities (Exhibit 10F). Dr. Rivadeneira opined, however, that the claimant is limited to jobs permitting alternating positions and unscheduled breaks. The medical evidence, however, does not support this conclusion and there is no support in the record for the claimant's assertion that he is limited to standing for 45 minutes or lifting 30 pounds. The claimant's treating physician was also unable to offer an opinion as to the claimant's physical ability to work, but did opine that the claimant's pain is severe enough to interfere with attention and concentration (Exhibit 11F). However, there is no indication in the medical evidence that the claimant experiences difficulty focusing or attending to tasks, nor does the claimant allege such limitations.
>
> As for the opinion evidence, great weight has been given to the opinions of the consultative examiners; Drs. Cohen and Fernandez, who opined that the claimant's ability to handle objects is impaired by his arthritis (Exhibits 2F, 13F). Dr. Cohen further opined that the claimant's ability to lift and carry is limited, and Dr. Fernandez concluded that the claimant's pain limits his ability to walk for extended periods. Great weight is also given to the opinions of the state agency medical consultants, who opined that the claimant is limited to frequent but not continuous or repetitive manipulative hand movements (Exhibits 5F, 14F). Though the state agency doctors concluded that the claimant is capable of medium exertion, the undersigned finds that the opinions of the consultative examiners, and the objective medical evidence, support limiting the claimant to a lesser level of exertion.
>
> In sum, the above residual functional capacity assessment is supported by the objective medical evidence, which indicates that the claimant retains the physical ability to perform at least light work The opinions of the state agency medical consultants support finding the claimant physically able to perform basic work activities, and the consultative examiners' conclusions support limiting the amount of time the claimant spends walking and handling objects.
>
> (Tr. 48-51).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the

13

contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claims are without merit.

More specifically, Plaintiff asserts that the ALJ "failed to address and properly evaluate significant treating source opinions provided by . . . [Plaintiff's] treating physicians." (DE-29, pg. 5). It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. Wireman v. Barnhart, 2006 WL 2565245 (Slip Op. at 8)(W.D.Va. 2006)(internal citations omitted). Furthermore, "while an ALJ may not reject medical evidence for no reason or the wrong reason . . .an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his rationale and if the record supports his findings." Id. (internal citations omitted).

While "the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). Rather, "a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Mastro, 270 F.3d at 178. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."

14

Craig, 76 F.3d at 590. In sum, "an ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion." Koonce v. Apfel, 166 F.3d 1209 (4th Cir. 1999) (unpublished opinion)(internal citations omitted).

In his decision, the ALJ fully explained his reasoning in weighing the medical evidence. These reasons were supported by substantial evidence and, therefore, this assignment of error is without merit.

**Conclusion**

For the aforementioned reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-28) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-30) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Friday, September 09, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE